FILED
2022 Feb-25  AM 09:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| JEREMY WAYNE WILLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-00872-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## <u>AFFIRMING THE DECISION OF THE COMMISSIONER</u>

Pursuant to 42 U.S.C. § 405(g), Plaintiff Jeremy Wayne Wills filed for review of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability benefits based on cardiomyopathy, obesity, moderate bilateral carpal tunnel syndrome, lumbar foraminal narrowing, and history of surgeries.  Doc. 1.  On July 26, 2017, Plaintiff Wills applied for disability benefits for the period beginning December 15, 2015, and the Commissioner denied his claim.  Doc. 13-3 at 27.

Pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties have consented to magistrate judge jurisdiction.  Doc. 15.  After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

1

## ISSUES FOR REVIEW

In this appeal, Plaintiff Wills argues that the court should reverse the Commissioner's decision because the administrative law judge (ALJ) improperly applied the Eleventh Circuit's "pain standard," and failed to accept Wills' subjective testimony regarding his pain.  Doc. 19 at 1.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:    (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council.

*See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled; the ALJ must determine the following:

(1)    whether the claimant is engaged in substantial gainful activity;

(2)    if not, whether the claimant has a severe impairment or combination of impairments;

(3)    if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)    if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)    if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the

Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act; the court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (quotation marks and citation omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial

4

evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (similar).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.    Plaintiff Wills' personal and medical history

Plaintiff Wills was born on March 3, 1984, and was 33 years old when he applied for disability benefits in July 2017.  Doc. 13-6 at 2.

In 2007 and 2008, Wills first had medical intervention for back problems (e.g., a herniated disc), including a lumbar laminectomy and a microdiscectomy.  Doc. 13-8 at 4, 8–12.  In 2008, he also was diagnosed with hypertension.  Doc. 13-8 at 13–17.

In December 2015, Wills presented to Childersburg Primary Care,

5

complaining that his back pain had returned and was so bad that he had difficulty lifting or standing on his left leg. Doc. 13-9 at 54–56. That same month, Wills went to the Birmingham Neurosurgery and Spine Group, where he presented with low back pain (for the prior two months), which was radiating to his left leg and was worse when sitting down. Doc. 13-8 at 83. He saw Dr. Samuel Bowen, who found that Wills' condition was mostly normal except for lumbar spinal stenosis. Doc. 13-8 at 83–88. Dr. Bowen suggested physical therapy and epidural injections. Doc. 13-8 at 88.

In late 2015 and early 2016, Wills received steroid injections for his back pain, and had imaging done that confirmed spinal stenosis and disc degeneration. Doc. 13-8 at 70–82; Doc. 13-9 at 57.

In April 2016, Wills went to Childersburg Primary Care with back pain radiating down his leg that was so severe it caused his knee to buckle and often caused him pain that he rated a 10 on a scale from 1-to-10. Doc. 13-9 at 52.

In May 2016, Wills had surgery for lumbar degenerative disk disease. Doc. 13-8 at 67–69, 198–206.

In June and August 2016, Wills went to the Birmingham Neurosurgery and Spine Group for post-operative wound checks; his examinations were normal, and his symptoms had improved such that he was not having much pain. Doc. 13-8 at 60–61, 63–66. He was scheduled for physical therapy. Doc. 13-8 at 61.

In September and October 2016, Wills' imaging showed lumbar abnormalities.  Doc. 13-8 at 46–50, 55.

In September, October, and November 2016, Wills continued going to the Birmingham Neurosurgery and Spine Group with complaints of back, hip, and leg pain that was not improving with physical therapy.  Doc. 13-8 at 41–45, 51–54, 56–59.  He was taking pain medication and muscle relaxers.  Doc. 13-8 at 41–45, 51–54, 56–59.  Other than his lumbar symptoms, his evaluations were essentially normal.  Doc. 13-8 at 41–45, 51–54, 56–59.

In 2016 and in January 2017, Wills received multiple steroid injections into his back that provided temporary relief—the last of those injections was on January 3, 2017.  Doc. 13-8 at 32–40.

On January 25, 2017, Wills went to the Birmingham Neurosurgery and Spine Group and saw Dr. Bowen about back and left leg pain that went down the outside of his leg.  Doc. 13-8 at 26.  Treatment notes stated that Wills had been given three pain blocks, but that they did not help his pain.  Doc. 13-8 at 26.  He had been treated with physical therapy.  Doc. 13-8 at 26.  His tests, including a spinal x-ray, were essentially normal.  Doc. 13-8 at 27–29.  Dr. Bowen ordered an MRI.  Doc. 13-8 at 30.  The same day, Dr. Gerald Karcher diagnosed Wills with "failed back syndrome" and anatomical changes since his prior surgery.  Doc. 13-8 at 31.

On February 3, 2017, Wills went to the Coosa Valley Medical Center with

chronic low back pain and received an MRI with contrast that identified mild lumbar spinal stenosis and a small foraminal protrusion/disc fragment. Doc. 13-8 at 25, 100.

On February 8, 2017, Wills returned to the Birmingham Neurosurgery and Spine Group complaining of continued low back pain and pain down the back of his left leg; other than lumbar spinal stenosis, Wills did not present with any identifiable issues. Doc. 13-8 at 96–99.

Three times in February 2017, Wills went to Childersburg Primary Care, complaining of hypertension and numbness in his left side. Doc. 13-9 at 27–28. His examinations were essentially normal. Doc. 13-9 at 27–31, 33–35.

On March 9, 2017, Wills again had lumbar spinal surgery to address recurrent lumbar spinal stenosis. Doc. 13-8 at 94, 173–78.

In April and May 2017, Wills saw Dr. Bowen at the Birmingham Neurosurgery and Spine Group for post-operative wound checks; Dr. Bowen noted that Wills' neural examination was normal, and that his preoperative symptoms had improved, though he still had pain in his left hip after activity. Doc. 13-8 at 90–93.

On July 6, 2017, Wills presented to Childersburg Primary Care with migraine headaches that had been occurring for three-and-a-half weeks, chronic back pain, anxiety, and hypertension. Doc. 13-9 at 16–18. Wills' physical examination was essentially normal, and he was prescribed the medication Toradol and told to continue his current medications. Doc. 13-9 at 17–18.

In August 2017, Wills went to Grandview Medical Group Neurology for headaches, numbness, and weakness.  Doc. 13-9 at 61–66.  Examinations showed mild radiculopathy with no denervation and essentially normal MRI results.  Doc. 13-9 at 66, 76–79.

Also in August 2017, Wills completed a "Function Report" as part of his disability proceedings—that is, after having filed his claim for benefits in July 2017.  Doc. 13-7 at 32–39.  He stated that he prepared meals daily, though they were "easy fast meals."  Doc. 13-7 at 34.  He also stated that he cut the grass, used a bushhog, and took out the trash when needed, though he could not carry the trash if it was too heavy.  Doc. 13-7 at 35.  He stated that he went out a few times daily either on foot or by car and was social.  Doc. 13-7 at 35–36.  He stated that he engaged in hobbies like hunting, fishing, and camping, but not very often because of his pain.  Doc. 13-7 at 36.

In September and October 2017, Wills went to Childersburg Primary Care for issues with controlling his hypertension.  Doc. 13-9 at 126–30.  In January 2018, Wills returned to Childersburg Primary Care again for reasons related to his blood pressure.  Doc. 13-9 at 131–33.

In February 2018, Wills returned to the Birmingham Neurosurgery and Spine Group and saw Dr. Bowen to discuss an MRI for back and left leg pain that had been treated with physical therapy.  Doc. 13-8 at 20.  Wills reported lumbar pain, but

denied headaches.  Doc. 13-8 at 21.  His physical examination was normal.  Doc. 13-8 at 22.  Dr. Bowen diagnosed Wills with lumbar spinal stenosis and recommended surgery.  Doc. 13-8 at 22.

In May 2018, Wills received an MRI for neck pain radiating to his left arm; the MRI showed minimal cervical spondylosis.  Doc. 13-9 at 90.

In June 2018, MetLife assessed a claim from Wills for disability benefits based on chronic low back pain.  Doc. 13-9 at 95.  A medical review by Dr. Dope Adewunmi for MetLife opined that Wills' physical condition supported functional limitations due to his lumbar degenerative disease, such that his activities should be limited, but that "[r]estricted full time work is supported."  Dr. Adewunmi found that, among other things, Wills still could sit continuously with the ability to shift positions when seated.  Doc. 13-9 at 97.

In January 2019, Wills presented to the Hamo Neurology Clinic, complaining of almost daily migraines for the prior eight months, neck pain with numbness and weakness on his left side, and back pain.  Doc. 13-10 at 2–7.  Wills was diagnosed with radiculopathy, low back pain, migraines, and other issues, and he was sent for medical testing.  Doc. 13-10 at 2–7.

In February 2019, Wills returned for a follow-up appointment and was prescribed Flexeril and a spinal tap to evaluate or help his headaches.  Doc. 13-10 at 8–10.  He underwent the spinal tap on February 15, 2019.  Doc. 13-10 at 18–20.

In March 2019, Wills again returned to the Hamo Neurology Clinic with the same complaints. Wills received an injection in his upper back for pain and another prescription for Flexeril, and he also was recommended physical therapy. Doc. 13-10 at 11–13.

From January 2019 to March 2019, Wills presented to Childersburg Primary Care multiple times complaining of shoulder pain and tingling in his left arm. Doc. 13-9 at 145–61. Follow-up cardiac tests were normal. Doc. 13-9 at 145–61. Wills had secondary complaints of lumbar pain and headaches at those appointments, but he said that the headaches had improved after a spinal tap. Doc. 13-9 at 145–61.

On April 17, 2019, Wills returned to the Birmingham Neurosurgery and Spine Group, complaining of pain in his neck and left arm for the prior year (which had worsened over the past three months), occipital headaches, and numbness and pain in his left arm. Doc. 13-9 at 112. Wills' physical examination was normal except that he was diagnosed with some cervical radiculopathy. Doc. 13-9 at 113–19.

In May 2019, Wills went to the Alabama Cardiovascular Group, and saw Dr. Jimmie Dotson for hypertension, palpitations, and dizziness. Doc. 13-10 at 7. Treatment notes show that Wills recently had been diagnosed with Rocky Mountain Spotted Fever from a tick bite. Doc. 13-10 at 31–33. Wills was encouraged to change his diet. Doc. 13-10 at 33.

11

**B.      Social Security administrative proceedings**

**1.      Initial application and denial of benefits**

On July 26, 2017, Wills applied for a period of disability and disability insurance benefits.  Doc. 13-6 at 2.  Wills stated that he became disabled on December 15, 2015.  Doc. 13-6 at 2.  Wills stated that he was disabled because of a back injury that caused herniated and bulging discs.  Doc. 13-7 at 3.

In assessing Wills' application, the SSA considered opinions from Dr. Robert Estock and Dr. Marcus Whitman.  Doc. 13-4.  Dr. Whitman opined that, based on his record, Wills could perform light work with some functional limitations.  Doc. 13-4 at 11–16.

Wills' application was denied on November 1, 2017, based on a determination that he was not disabled.  Doc. 13-4.  Wills requested a hearing before an ALJ.  Doc. 13-5 at 11.

**2.      ALJ hearing**

An ALJ conducted a hearing on May 22, 2019.  Doc. 13-3 at 16, 36.

At the hearing, Wills testified that he previously worked for an electric company as a foreman of a lineman crew.  Doc. 13-3 at 37–38.  He also previously had worked as an electrician and an industrial cleaner.  Doc. 13-3 at 38–39.  Wills testified that he had not had substantial work since 2015.  Doc. 13-3 at 39–40.  Wills stated that he was on long-term disability from MetLife.  Doc. 13-3 at 40.

Wills testified that he was 6 feet and 4 inches tall, that he weighed 257 pounds, and that he was right-handed.  Doc. 13-3 at 41.  Wills testified that he had a driver's license and still drove.  Doc. 13-3 at 41.

Wills testified that his biggest issue was mobility because of pain in his shoulders, arms, and down his left side; he also mentioned problems concentrating.  Doc. 13-3 at 42.  He testified that his back was his biggest problem, and that he already had three back surgeries, the most recent of which was in 2017.  Doc. 13-3 at 43.  Wills testified that he had pain like fire that was hard to explain and that went down his leg and into his hip.  Doc. 13-3 at 43.  He testified that he had pain into his leg every morning when he got out of bed and essentially whenever he stood up or walked, but that taking weight off his leg helped with the pain.  Doc. 13-3 at 44–45.  Wills testified that his pain was usually at about a level of 5 or 6 on a scale from 1-to-10.  Doc. 13-3 at 45.

Wills testified that he also had "aggravating" nerve issues with his neck that possibly arose from a tick bite, but that the issues with his neck were not as severe as the issues with his back.  Doc. 13-3 at 45–46.  Wills said that his issues with his lower back were more severe, and that his next most severe issue was headaches from which he had started suffering about a year ago.  Doc. 13-3 at 46.  Wills testified that he took a lot of over-the-counter headache medication.  Doc. 13-3 at 46.  He testified that, at first, the headaches had been about once per week, but that they had

13

increased in frequency until he had spinal fluid drained; after that, the headaches had reduced back to approximately once per week.  Doc. 13-3 at 46.  He testified that the length of the headaches could vary—sometimes they lasted two hours and sometimes they could last all day.  Doc. 13-3 at 46.  He also testified that the headaches were sometimes "almost crippling."  Doc. 13-3 at 46.  He stated that about once every two weeks he would have a headache that was so bad that he could "barely open [his] eyes."  Doc. 13-3 at 47.  Wills also testified that he had trouble seeing out of his left eye.  Doc. 13-3 at 47.

Wills testified that he had issues with "tingling" and weakness in his left arm to the extent that he could not really pick up a gallon of milk with that arm.  Doc. 13-3 at 49.  He said that he had been having the tingling issues for "a couple of years," and that he experienced it most days.  Doc. 13-3 at 49.  Wills testified that the condition had been worsening, and that he had not been able to lift a gallon of milk for about 6-to-8 months.  Doc. 13-3 at 50.

Wills also testified that he experienced brain fog that he thought was attributable to a tick bite that he had sustained around five years ago.  Doc. 13-3 at 50–51.  In connection with the tick bite, Wills also testified that he had daily heart palpitations that had been "really bad" for the past three months, such that he had been wearing a heart monitor for two weeks.  Doc. 13-3 at 51.

Wills testified that he had nerve pain in his upper back constantly at a pain

14

level of about 6 or 7 on a scale from 1-to-10.  Doc. 13-3 at 52.  The ALJ asked Wills

if that pain was worse than his back pain; Wills said that it was not worse, but that

all the pain was tied together.  Doc. 13-3 at 52.

Wills testified that he thought he could lift about 20 pounds with his right arm

and only could sit and stand for around 30 minutes without pain.  Doc. 13-3 at 53.

He also testified that he could not walk very far without pain.  Doc. 13-3 at 54.

Wills testified that he usually did not need assistance taking care of himself.

Doc. 13-3 at 54.  He testified that he did not do any household chores or tasks.  Doc.

13-3 at 55.  The ALJ asked Wills to explain a typical day, and he said that he got up

and went to the couch, then did not do much else except sometimes go visit his

father-in-law.  Doc. 13-3 at 55.  When the ALJ asked for elaboration, Wills testified

that he did not know what to say, then added, "I may go to the store and get a drink

or something," but most of the time he was just on the couch watching television.

Doc. 13-3 at 55–56.

In response to questioning from counsel, Wills testified that, whenever he

tried to do something "significant" like take his son fishing or stay on his feet for

more than two or three hours, he could not really do anything for the next two days.

Doc. 13-3 at 56–57.  He said that he had not been fishing in almost a year and had

to give up hunting, which he previously enjoyed.  Doc. 13-3 at 57–58.

Wills testified that he could not work at a job even with a sit/stand option

because sometimes he needed to lie down.  Doc. 13-3 at 59.  He testified that he took medication for his pain, but that it did not help very much.  Doc 13-3 at 60.  He said that he had three surgeries on his back and multiple pain blocks.  Doc. 13-3 at 60.

A vocational expert (or "VE"), Debra G. Civils, then testified.  Doc. 13-3 at 61–65.  The ALJ posed questions to Civils about a hypothetical individual with Wills' qualifications and limitations.  Doc. 13-3 at 62–64.  Civils testified that jobs for such an individual existed in significant numbers in the national economy.  Doc. 13-3 at 62–64.

### 3.      ALJ decision

On June 12, 2019, the ALJ entered an unfavorable decision.  Doc. 13-3 at 13. The ALJ determined that Wills had not been disabled from December 15, 2015, through the date of the decision.  Doc. 13-3 at 16.

The ALJ applied the five-step sequential process (*see* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4); *Winschel*, 631 F.3d at 1178).  Doc. 13-3 at 17–18.  On the first four steps, the ALJ determined the following:  Wills met the insured requirements through December 31, 2020; he had not engaged in substantial gainful activity since the alleged onset date of December 15, 2015; he had severe impairments consisting of cardiomyopathy, obesity, moderate bilateral carpal tunnel syndrome, lumbar foraminal narrowing, and a history of surgeries; he did not have impairments that met or equaled relevant Social Security "Listings"; and he could

not perform his past relevant work.  Doc. 13-3 at 18–26.  In determining Wills'
impairments, the ALJ exhaustively considered Wills' medical history.  Doc. 13-3 at
18–21.

In assessing whether Wills could perform his past relevant work (at step four),
the ALJ determined that Wills had the "residual functional capacity" (RFC) to
perform light work with the following limitations:  standing or walking for more
than four hours total; sitting for up to six hours; no operating foot controls or
climbing; balancing and stooping, but not kneeling, crouching, or crawling;
occasional reaching overhead; frequent but not constant gross manipulation; and
avoidance of extreme environments.  Doc. 13-3 at 22.  The ALJ stated that he had
considered all of Wills' symptoms and the extent to which they reasonably could be
"accepted as consistent with the objective medical evidence and other evidence."
Doc. 13-3 at 22.

In assessing Wills' RFC and the extent to which Wills' symptoms limited his
functioning, the ALJ reasoned that he "must follow" the required "two-step
process":  (1) "determine[] whether there is an underlying medically determinable
physical or mental impairment[] . . . that could reasonably be expected to produce
the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence,
and limiting effects of the claimant's symptoms to determine the extent to which
they limit the claimant's functional limitations."  Doc. 13-3 at 22.  The ALJ also

17

stated the relevant factors to consider Wills' subjective testimony and RFC, according to the applicable regulations.  Doc. 13-3 at 22–23.

The ALJ summarized Wills' hearing testimony, stating that Wills asserted an inability to work due to chronic back pain from all of his surgeries, continued daily hip or leg pain exacerbated by standing for too long, pain with sitting (though that pain was better than with standing or walking), left arm tingling, and weakness.  Doc. 13-3 at 23.  The ALJ noted that Wills had received treatment for his impairments. Doc. 13-3 at 23.

Nevertheless, the ALJ found that Wills' statements "concerning the intensity, persistence, and limiting effects of these impairments [we]re not consistent with the objective medical evidence."  Doc. 13-3 at 23.  The ALJ also found that Wills' descriptions of his symptoms and limitations were "generally inconsistent and unpersuasive."  Doc. 13-3 at 23.  Overall, in light of the record evidence, the ALJ found that Wills' symptoms did not support an inability to work.  Doc. 13-3 at 23.

In arriving at that conclusion, the ALJ noted that Wills had testified that the most severe issues that precluded him from working were related to back pain.  Doc. 13-3 at 23.  The ALJ then summarized Wills' treatment for his back pain, noting that Wills had multiple surgeries, that his symptoms had improved after surgery, and that he did not have many follow-up appointments for his back condition.  Doc. 13-3 at 23.  The ALJ also noted that the anatomical and physiological results of Wills' post-

18

operative examinations did not support Wills' testimony about his pain.  Doc. 13-3 at 23–24.  The ALJ found the opinion of Dr. Adewunmi for MetLife persuasive, because it was consistent with and supported by the record.  Doc. 13-3 at 24.  The ALJ addressed Wills' obesity, and found that it did not combine with Wills' other conditions to render him disabled.  Doc. 13-3 at 24–25.  The ALJ also considered Wills' "Function Report."  Doc. 13-3 at 25.

After considering Wills' subjective testimony and the other record evidence, the ALJ found that Wills' "impairments would reasonably limit him" to the extent reflected in the RFC finding.  Doc. 13-3 at 25–26.  The ALJ also noted that Dr. Marcus Whitman's opinion—i.e., that Wills could perform light work—was persuasive because it was consistent with and supported by the record.  Doc. 13-3 at 26.

Based on Wills' RFC and qualifications, as well as the testimony of the vocational expert (Civils), the ALJ found that Wills could have made a "successful adjustment to work that existed in significant numbers in the national economy."  Doc. 13-3 at 26–27.

Consequently, the ALJ concluded that Wills was "not disabled" at any time from December 15, 2015, through the date of the decision.  Doc. 13-3 at 27.

### 4.    Appeals Council decision

The Appeals Council found no reason under its rules to review the ALJ's

decision.  Doc. 13-3 at 2.  The Appeals Council noted that Wills had submitted records from Childersburg Primary Care from 2018 and 2019, but that the records were not new evidence because they were only copies of evidence that had already been submitted.  Doc. 13-3 at 3.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.

## I.   The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard."  When a claimant attempts to establish disability through his own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies.  That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms.  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also* 20 C.F.R. § 404.1529 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting

effects of [his] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled."  20 C.F.R. § 404.1529(c)(4); *see also Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, the ALJ's decision articulated and tracked that controlling legal standard.  In analyzing Plaintiff Wills' "residual functional capacity" (RFC), and the extent to which Wills' symptoms limited his functioning, the ALJ reasoned that the ALJ "must follow" the required "two-step process":  (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."  Doc. 13-3 at 22.  Thus, the ALJ's decision was based on the proper legal standards.

## II.   Substantial evidence supported the ALJ's decision to discredit Plaintiff Wills' subjective testimony regarding his pain.

Substantial evidence supported the ALJ's decision not to credit Plaintiff Wills' subjective testimony regarding his pain.

### A.   The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and

adequate reasons for discrediting a claimant's subjective testimony.  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).  A claimant can establish that he is disabled through his "own testimony of pain or other subjective symptoms."  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements."  20 C.F.R. § 404.1529(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of his symptoms, the ALJ must consider all of the evidence, objective and subjective.  20 C.F.R. § 404.1529.  Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, his precipitating and aggravating factors, his daily activities, the type, dosage and effects of his medications, and treatments or measures that he has to relieve the symptoms. *See* 20 C.F.R. § 404.1529(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [his] symptoms."  20 C.F.R. § 404.1529(c)(4).  If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must

articulate explicit and adequate reasons for doing so." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). (emphasis added).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar). "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer*, 395 F.3d at 1210 (quotation marks and alterations omitted).[1]

**B.    The ALJ properly explained the decision not to credit Wills' subjective testimony regarding his pain, and substantial evidence supported that decision.**

The ALJ properly explained the decision to discredit Wills' subjective testimony regarding his pain, and substantial evidence supported the ALJ's decision.

---

[1] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting SSR 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

Not only did the ALJ's decision articulate and track the multi-part "pain standard" (*see* Part I *supra*), but also the ALJ's decision tracked the Eleventh Circuit law and applicable regulations for evaluating a claimant's subjective testimony (discussed above in Part II.A *supra*).

Among other things, "[i]n assessing [Wills'] subjective allegations and [RFC]," the ALJ's decision stated the "factors relevant to [Wills'] alleged symptoms, such as pain," according to the applicable regulations.  Doc. 13-3 at 22–23.

The ALJ's decision also stated that the ALJ "ha[d] considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p."  Doc. 13-3 at 22.

In this appeal, Wills argues that the ALJ improperly applied the Eleventh Circuit's pain standard and improperly failed to accept his subjective pain testimony, because the ALJ failed to address whether Wills' medically determinable impairments could reasonably be expected to give rise to the alleged pain.  Doc. 19. As explained above, 20 C.F.R. § 404.1529—one of the regulations cited in the ALJ's decision, Doc. 13-3 at 22—requires that "[t]here must be objective medical evidence from an acceptable medical source that shows [a claimant] ha[s] a medical impairment(s) which could reasonably be expected to produce the pain or other

24

symptoms alleged."   20 C.F.R. § 404.1529; *accord Wilson*, 284 F.3d at 1225 (requiring that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms).

Wills is correct that the ALJ did not *explicitly* find whether Wills' objectively determined medical conditions could reasonably be expected to give rise to his alleged symptoms.  *See* Doc. 13-3 at 23; *Wilson*, 284 F.3d at 1225; 20 C.F.R. § 404.1529.  But the lack of that explicit finding does not provide any basis for reversal.  Arguably, that finding is *implicit* in the ALJ's decision, because without a determination that Wills' medical conditions could reasonably be expected to give rise to the alleged symptoms, there was no reason for the ALJ to proceed to the next part of the pain standard—i.e., to assess the intensity, persistence, and limiting effects of Wills' symptoms.  Alternatively, the ALJ assumed without deciding that Wills' medically determinable impairments could be expected to cause the alleged pain.  Practically speaking, in either event, the ALJ's decision lightened Wills' burden to establish disability, and any error was "harmless."  *See Washington v. Saul*, No. 4:19-CV-00462-MHH, 2020 WL 5658905, at *4 (N.D. Ala. Sept. 23, 2020) (finding that the ALJ's failure to articulate whether the claimant's impairments could cause the claimant's alleged pain was harmless).

Regardless (and as explained above), the ALJ's decision proceeded to the next step in the analysis under the pain standard—that is, "evaluat[ing] the intensity,

persistence, and limiting effects of [Wills'] symptoms to determine the extent to which they limit [his] functional limitations." Doc. 13-3 at 22. The ALJ's decision *still* articulated explicit and adequate reasons for discrediting Wills' subjective testimony regarding his pain, and that decision *still* was supported by substantial evidence. *See Holt*, 921 F.2d at 1223. So, even if the ALJ explicitly had found that Wills' objectively determined medical conditions could reasonably be expected to give rise to his alleged symptoms, the ALJ's decision still would have been the same. (And, if the ALJ instead explicitly had found that Wills' objectively determined medical conditions could *not* reasonably be expected to give rise to his alleged symptoms, then that would have been an additional, alternative basis for the ALJ's unfavorable decision.)

Indeed, the ALJ explicitly found at the next step of the analysis that Wills' statements "concerning the intensity, persistence, and limiting effects of [his] impairments [we]re not consistent with the objective medical evidence." Doc. 13-3 at 23; *see also* 20 C.F.R. § 404.1529(c)(4); *see also Hargress*, 883 F.3d at 1307.

In determining that Wills' testimony about the intensity, persistence, and limiting effects of his impairments was not consistent with the record, the ALJ summarized Wills' testimony and explained that it was internally inconsistent and unpersuasive; the ALJ also found that Wills' testimony was contrary to the objective medical evidence and other evidence. Doc. 13-3 at 23–24. The ALJ noted that Wills

26

had only limited follow-up appointments after his most recent back surgery, that post-operative examinations were not consistent with his testimony about his level of pain, and that his testimony was not consistent with the persuasive opinion from Dr. Adewunmi (MetLife). Doc. 13-3 at 23–25.

In addition, the ALJ considered Wills' "Function Report" and his reported daily activities. Doc. 13-3 at 25. The ALJ also specifically noted that Wills suffered enough pain to cause him significant limitations (for which the ALJ accounted in the RFC determination), but the ALJ found that the pain was not enough to be disabling. Doc. 13-3 at 25–26.

In short, the ALJ gave a detailed and specific explanation that Wills' testimony was not consistent with the record. Thus, the ALJ's decision included the necessary "explicit and adequate reasons" for discrediting Wills' subjective testimony that he could not work, and also accounted for Wills' subjective testimony regarding his pain in the RFC determination. *Wilson*, 284 F.3d at 1225.

In this regard, substantial evidence supported the ALJ's decision. Among other things, Wills' medical records showed improvement in his lumbar pain after his last surgery (Doc. 13-8 at 90–93), and improvement in his headaches after a spinal tap (Doc. 13-9 at 145–61). His physical examinations showed very limited abnormalities. *See, e.g.*, Doc. 13-8 at 22, 27–29; Doc. 13-9 at 66, 76–79, 113–19. Wills' "Function Report" stated that he still could do chores and engage in social

activities.  Doc. 13-7 at 35.  Additionally, Dr. Adewunmi opined that Wills' work should be restricted, but never that Wills could not work at all.  Doc. 13-9 at 97. That evidence contradicts Wills' testimony about completely disabling pain.

There is sufficient evidence based on which a reasonable person would accept the ALJ's finding that Wills' testimony was not consistent with the record.  *See Crawford*, 363 F.3d at 1158.  Accordingly, substantial evidence supported the ALJ's decision.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court **AFFIRMS** the Commissioner's decision.  The court separately will enter final judgment.

**DONE** and **ORDERED** this February 25, 2022.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE